IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

YURY SHADRIN, on his own behalf
and on behalf of all others similarly
situated,

    *Plaintiff*,

v.

HUNTER WARFIELD INC., *et al.*,

    *Defendants*.

Civil Action No. ELH-22-3228

**MEMORANDUM OPINION**

Plaintiff Yury Shadrin, individually and on behalf of two putative classes, filed suit against defendants Hunter Warfield, Inc. ("Hunter" or "HWI"); Doncaster Village Apartments, LLC ("Doncaster" or "DVA"); and Continental Realty Corporation ("CRC" or "Continental"). *See* ECF 2 (the "Complaint"). The suit is rooted in plaintiff's prior tenancy at an apartment complex in Parkville, Maryland that is owned and/or managed by defendants DVA and CRC.[1]

The two proposed classes are identified as follows. One is called the "Letter Class," and encompasses individuals to whom HWI, a licensed collection agency, sought more than 6% simple interest on a rent-related debt. *Id.* ¶ 43. The other is called the "Renewal Class," and encompasses individuals who were subjected to a rent increase by CRC or DVA following an automatic lease renewal. *Id.* ¶ 44.

---

[1] Suit was initially filed in the Circuit Court for Baltimore County on November 4, 2022. ECF 1-2. Hunter timely removed the case to federal court, based on federal question jurisdiction, pursuant to 28 U.S.C. §§ 1331, 1441. ECF 1 ("Notice of Removal"); *see also* ECF 8. Jurisdiction is founded on plaintiff's FDCPA claim. ECF 2 at 12. The Court has supplemental jurisdiction with respect to plaintiff's State law causes of action, pursuant to 28 U.S.C. § 1367. CRC and DVA consent to the removal. *See* ECF 1-3; ECF 1-4. And, plaintiff does not object to the Court's jurisdiction. *See* Docket.

The suit contains four counts.  In Count I, plaintiff asserts a claim against HWI on behalf of the so called "Letter Class" for violation of the Fair Debt Collection Practices Act ("FDCPA" or the "Act"), 15 U.S.C. §§ 1692 *et seq*. Count II, lodged on behalf of both classes, against all defendants, asserts a violation of the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code (2013 Repl. Vol., 2022 Suppl.), §§ 14–201 *et seq.* of the Commercial Law Article ("C.L."). Count III asserts a claim against all defendants, on behalf of both classes, pursuant to the Maryland Consumer Protection Act ("MCPA"), C.L. §§ 13–101 *et seq.* And, Count IV, lodged against DVA and CRC on behalf of the Letter Class, is founded on Md. Code (2015 Repl. Vol, 2022 Suppl.), § 8-208(g) of the Real Property Article ("R.P.").

Hunter answered the Complaint. ECF 11.  However, Doncaster and Continental jointly moved to dismiss all claims against them, pursuant to Fed. R. Civ. P. 12(b)(6).  ECF 13.  The motion is supported by a memorandum (ECF 13-1) (collectively, the "Motion"), as well as several exhibits. ECF 13-3 to ECF 13-7. Plaintiff opposes the Motion (ECF 14, the "Opposition"), supported by exhibits.  ECF 14-1 to ECF 14-3.  Defendants replied. ECF 19.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion in part and deny it in part.

## I.      Factual and Procedural Background[2]

On March 18, 2020, Shadrin signed a Lease Agreement with CRC for an apartment on Tadmore Court in Parkville, for the period of March 20, 2020 to July 19, 2020, at a monthly rental

---

[2] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).  The Court may also consider some of the exhibits submitted by the parties.

Throughout the Memorandum Opinion, the Court cites to the electronic pagination. However, the electronic pagination does not always correspond to the page number imprinted on a particular submission.

of $1,235.00. ECF 2, ¶ 10; ECF 13-3 (the "Lease") at 2, 14.  Plaintiff paid a security deposit of $350.  ECF 2, ¶ 10; ECF 13-3 at 2.

The apartment complex is owned by Doncaster and managed by CRC. ECF 13-3 at 2, 20; *see also* ECF 2, ¶ 7 ("On information and belief, CRC conducts substantially all of DVA's business."). Shadrin asserts that "CRC is in common ownership with, or has an ownership interest in, DVA." ECF 2, ¶ 6.  According to Shadrin, when he rented the Apartment, he told CRC that he would not be renewing the Lease.  *Id.* ¶ 19.[3]

The Lease contains a late charge provision.  It provided, ECF 13-3 at 6-7:

30.    LATE CHARGE: Resident will pay, as additional rent, a charge of five (5%) percent of the amount of rent due, for the rental period for which the payment was delinquent, as a late charge in the event that Resident shall fail to pay, both while occupying the Premises and after vacating same, an installment of the rent for a period of four (4) days beyond the date on which it became due and payable. This shall not constitute a waiver of Management's right to institute proceedings for rent, damages and/or repossession of the Premises for non-payment of any installment of rent.

Paragraph 44 of the Lease provides for "Prejudgment Interest," as follows, *id.* at 8:

If Resident violates this Lease Agreement and said violation results in a monetary loss to Management, then Management shall be entitled to prejudgment interest at the highest rate allowed by law, but in no event more than ten percent (10%) per annum, on the amount due Management, from the date the Management mails its written list of damages to Resident.

*See also* ECF 2, ¶ 36.

The Lease also contains several addenda signed by plaintiff.  One is titled "<u>ADDENDUM TO LEASE – AUTOMATIC RENEWAL OF LEASE.</u>" ECF 13-3 at 16.  It states, in part, ECF 2, ¶ 11; ECF 13-3 at 16 (boldface omitted):

The tenancy created under the Lease (including any renewal or extension of this tenancy) shall continue from month to month after its expiration, subject to the same covenants, agreements, rules and regulations as are set forth in the Lease,

---

[3] No documentation was submitted that confirms the assertion.

unless Management mails to Resident or Resident mails to Management written notice (sent in accordance with Section No. 18 of the Lease Agreement), at least two (2) months prior to the expiration date of the then existing term, of said Management's or Resident's intention not to renew the Lease. If Management mails a notice to the Resident of its intention to terminate the then existing Lease term, and in said notice offers the Resident a new Lease term pursuant to the terms and conditions therein contained, and if the Resident does not otherwise notify Management (in accordance with Section 18 of the Lease Agreement) within fifteen (15) days of the mailing of the Management's notice of the Resident's intent not to renew the Lease, the Resident shall be considered as Resident under the terms and conditions specified in Management's notice. If more than one person shall be Resident hereunder, notice given to or by any one of them shall bind all.

On April 2, 2020, CRC sent a letter to Shadrin offering new lease terms for renewal. ECF 2, ¶ 20; ECF 13-5 (the "April 2020 Letter"). The April 2020 Letter stated, in part, ECF 13-5: "It has been a pleasure to have you call our community your home and we hope you choose to continue to stay with us." Further, the April 2020 Letter stated, *id.*: "As your current lease term will end on 7/19/20, we would like to offer you a new lease . . . . Please review the following options for your renewal lease term." And, the April 2020 Letter set forth the following terms, *id.*:

| Term (No. of Months) | Monthly Rental Rate | Term (No. of Months) | Monthly Rental Rate |
|---|---|---|---|
| 12 | $1,235.00 | 7 | $1,295.00 |
| 11 | $1,255.00 | 6 | $1,300.00 |
| 10 | $1,280.00 | 5 | $1,354.00 |
| 9 | $1,295.00 | 4 | $1,365.00 |
| 8 | $1,285.00 | 1 (MTM) | $1,500.00 |

In addition, the April 2020 Letter stated: "To take advantage of these rates, you will need to select a new term." *Id.* at 2; *see* ECF 2, ¶ 21. The April 2020 Letter also advised plaintiff, ECF 13-5 at 2 (boldface omitted):

Notice of renewal or intent to vacate will need to be completed by 05/20/2020, which is sixty (60) days prior to your lease expiration. Please note that upon expiration of your existing lease, if your lease renewal has not been executed, your lease agreement will automatically renew on a month-to-month basis at a monthly rental rate of $1,500.00.

4

Plaintiff asserts that the April 2020 Letter was not a notice of intent to terminate the Lease, "because it did not say the lease would terminate." ECF 2, ¶ 22.  Defendants agree that the April 2020 Letter was not a notice to terminate. ECF 13-1 at 5 ("It is undisputed that the April 2020 Letter was not a notice of the CRC Defendants' intent to terminate the Lease.[1]"). They also assert that the "deadline for Plaintiff to provide written notice of his intention to vacate remained May 20, 2020." *Id.* And, plaintiff claims that Continental did not provide the required 60 days' notice of intent to terminate.  ECF 2, ¶ 23.

Even if the April 2020 Letter was a notice of intent to terminate, plaintiff asserts that it provided "an inaccurate date" by which plaintiff had to give notice of his intent not to renew.  ECF 2, ¶ 24. Plaintiff points out that, according to the Addendum's Automatic Renewal Clause, a notice of intent to terminate, coupled with an offer of new terms, "triggered" a 15-day period for the Tenant to indicate whether to accept.  *Id.*  However, the April 2020 Letter specifies a date of May 20, 2020, for a notice of intent to vacate.

Thereafter, on June 9, 2020, Continental sent a follow-up e-mail to Shadrin. ECF 2, ¶ 26; *see* ECF 13-6. CDC said, in part, ECF 2, ¶ 26; ECF 13-6 (emphasis in ECF 13-6):

> You've passed your deadline and your lease will automatically renew at a month-to-month rate of **$1,500.00** if your lease agreement isn't signed by the end of **TODAY**.

As noted, the April 2020 Letter made clear that plaintiff had to provide notice of intent to terminate by May 20, 2020, in order for the tenancy to end by July 19, 2020.  *See* ECF 13-5. Nevertheless, on June 18, 2020, "Shadrin gave written notice that he intended to move out on July 19, 2020, at the end of the lease." ECF 2, ¶ 27.  Continental responded. *Id.* ¶ 28.  In a letter to plaintiff from Wendy Dugan, an Assistant Manager, dated June 18, 2020 (ECF 13-7, the "June 2020 Letter"), Dugan stated, *id.* at 1 (emphasis in original):

> This letter acknowledges receipt of your intention to vacate your apartment on **August 19, 2020**. I'm aware that your email stated that you plan on moving out on July 19, 2020, but sufficient notice was not given. Therefore, your lease has automatically renewed at a month-to-month rate and you'll be financially responsible for the apartment up until 8/19/20 (please refer to page 15 of your lease agreement). Your month-to-month rate will be $1,500.

The June 2020 Letter also included as an attachment a copy of the automatic renewal lease addendum, discussed earlier. ECF 13-7 at 2.

According to plaintiff, the June 2020 Letter "falsely" claimed "receipt" of his intention to vacate on August 19, 2020.  ECF 2, ¶ 28.  And, because Shadrin "disputed the legitimacy" of the rent increase and the automatic renewal, *id.* ¶ 29, he refused to pay the additional money that CRC claimed he owed. *Id.* ¶ 30. Moreover, he reported CRC to the Consumer Protection Division of the Office of the Attorney General. *Id.* ¶ 29.

CRC "placed Mr. Shadrin's alleged debt with HWI for collection." *Id.* ¶ 31. HWI, a licensed collection agency in Maryland, *id.* ¶ 3, wrote to Shadrin on February 10, 2022, seeking to collect "an alleged debt owed to Doncaster Village-515," in the sum of $1,193.46 in principal and prejudgment interest of $114.83. ECF 2, ¶ 32; *see also* ECF 14-1 (the "HWI Letter"). The HWI Letter, titled "Resolution Offer," provided plaintiff with the opportunity to "resolve" his debt for "the reduced amount of $649.18, approximately a 50% savings!"  ECF 14-1 at 1.  It stated, *id.*:

> If you fail to take advantage of this offer, interest will accrue making your payoff greater than the amount set forth above. Because of interest at the rate of 8.00%, the amount due on the day you pay may be greater than the amount shown above. Hence, if you make payment more than 30 days after the date of this letter, an adjustment may be necessary after we receive your check, in which event we will inform you. Please contact our office for your payoff.

*See also* ECF 2, ¶ 33.

As noted, the Lease provided for prejudgment interest "at the highest rate allowed by law" for violations of the Lease that result in "monetary loss to Management." ECF 13-3 at 8, ¶ 44; *see*

*also* ECF 2, ¶ 36.  Plaintiff maintains that the legal rate of interest in Maryland is 6%.  ECF 2, ¶¶ 34, 35.

Shadrin asserts that the HWI Letter "is a standard form letter sent to many other consumers concerning residential rental debts in Maryland." *Id.* ¶ 38.  Further, plaintiff contends, that the renewal provision of the Lease is unenforceable because it was "incorporated with the new terms provision," *id.* ¶ 104, and it was not specifically accompanied by the tenant's initials or signature. *Id.* ¶ 105. Plaintiff also asserts that defendants violated the law by charging prejudgment interest exceeding 6%, and by increasing Shadrin's rent without his consent.  *Id.* ¶¶ 33-37, 72-76.

Additional facts are included, *infra*.

## II. Standard of Review

Defendants have moved to dismiss the Complaint under Fed. R. Civ. P. 12(b)(6).  ECF 10. A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *Nadendla v. WakeMed*, 24 F.4th 299, 304-05 (4th Cir. 2022); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short

and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Nadendla*, 24 F.4th at 304-05; *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby*, *Miss.*, 574 U.S. 10, 10 (2014) (per curiam).  But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief.  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation.  *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).  If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief.  *Iqbal*, 556 U.S. at 678.  Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012). But, "[m]ere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion. *Morrow v. Navy Federal Credit Union*, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022).

In connection with a Rule 12(b)(6) motion, courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R.*

*Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

Notably, a plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of opposition briefing. *See, e.g.*, *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy."); *Glenn v. Wells Fargo Bank, N.A.*, DKC-3058, 2016 WL 3570274, at *3 (D. Md. July 1, 2016) (declining to consider declaration attached to brief opposing motion to dismiss because, among other things, it included allegations not alleged in the suit); *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n. 4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998); *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) ("'[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss'") (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984)), *aff'd*, 2 F.3d 56 (4th Cir. 1993).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). *See Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan*

*Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).   In contrast, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]"  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167.  Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.*  Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

Under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).  In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines,* 822 F.3d at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855

11

F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012).

To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)) (emphasis in original) (citation omitted); *see also Brentzel v. Fairfax Transfer and Storage, Inc.,* 2021 WL 6138286, at *2 (4th Cir. Dec. 29, 2021) (per curiam); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Under the principles outlined above, I may consider the HWI Letter (ECF 14-1), submitted by plaintiff with the Opposition (ECF 14). This is because it is referenced in or otherwise integral to the Complaint. ECF 2, ¶¶ 32, 33, 38. Moreover, its authenticity is not disputed, and defendants do not take issue with it.

With the Motion, defendants submitted the Lease (ECF 13-3); the April 2020 Letter (ECF 13-4); and the June 2020 Letter (ECF 13-5). These exhibits are expressly referenced in the

Complaint, *see* ECF 2 ¶¶ 10, 20, 26,   and plaintiff does not challenge their authenticity. Accordingly, I may consider these exhibits at this stage.

Defendant has also submitted Case Dockets for Yury Shadrin (ECF 13-4) to establish that Shadrin is a sophisticated landlord, rather than an unsophisticated tenant. ECF 13-1 at 3. In particular, the docket sheets seem to indicate that plaintiff is a landlord who has filed suits against tenants in the District Court for Baltimore County.  There is no indication as to the nature of the rentals or the terms.

"A federal district court may take judicial notice of documents from state court proceedings and other matters of public record in conjunction with a Rule 12(b)(6) motion without converting it to a motion for summary judgment." *Parikh v. Frosh*, PX-22-110, 2023 WL 131043, at *5 (D. Md. Jan. 9, 2023) (quoting *Green v. Wells Fargo Bank, N.A.*, 927 F. Supp. 2d 244, 246 n. 2 (D. Md. 2013).  But, at this juncture, the Court cannot rely on such skeletal documents to determine that plaintiff  is a sophisticated landlord.  Moreover, at this juncture, the Court cannot make findings of fact.

There is no basis to consider the remaining exhibits (ECF 14-2; ECF 14-3).

### III.  Legal Principles

### A.  Principles of Contract Interpretation

"Leases are contracts and, as such, are to be construed by application of the well established rules of contract interpretation." *Middlebrook Tech, LLC v. Moore*, 157 Md.App. 40, 65, 849 A.2d 63, 778 (2004) (citing *Sy–Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 829 A.2d 540 (2003)). Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court."  *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v.*

*Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017).

"'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted).  To determine the parties' intention, courts look first to the written language of the contract.  *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement.").

"Maryland courts interpreting written contracts have long abided by the law of objective contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Urban Growth Prop. Ltd. P'ship v. One W. Balt. St. Assocs. LLC*, No. 882, Sept. Term, 2015, 2017 WL 526559, at *5 (Md. Ct. Spec. App. Feb. 9, 2017) (citation omitted) (unpublished); *see Cochran v. Norkunas*, 398 Md. 1, 16, 919 A.2d 700, 709 (2007); *W.F. Gebhardt & Co., Inc. v. American European Ins. Co.*, 250 Md. App. 652, 666, 252 A.3d 65, 73 (2021); *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014) (internal quotations and alteration omitted).   A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract subjectively intended or personally thought it meant.  *See Martz v. Day Development Co., L.C.*, 35 F.4th 220, 225 (4th Cir. 2022); *Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees' Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768

A.2d 1029, 1032 (2001); *see also, e.g., Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed."), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997).

A court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement." *Dumbarton*, 434 Md. at 52, 73 A.3d at 232. Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id*. (quoting *Gen. Motors Acceptance v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985); *see Cochran*, 398 Md. 1, 919 A.2d at 710 ("Under the objective theory of contracts, [courts] look at what a reasonably prudent person in the same position would have understood as to the meaning of the agreement."); *Scarlett Harbor*, 109 Md. App. at 291, 674 A.2d at 142 ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated.").

Notably, "the plain meaning is determined by 'focus[ing] on the four corners of the agreement.'" *Martz*, 35 F.4th at 225 (citation omitted) (alteration in *Martz*). "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citations omitted). But, Maryland courts also turn to the dictionary "'to supply contractual language with its ordinary and accepted meanings . . . .'" *W.F. Gebhardt & Co., Inc.*, 250 Md. App. at 668, 252 A.3d at 74 (quoting *Credible Behavioral Health, Inc. v. Johnson*, 466 Md. 380, 394, 220 A.3d 303, 311 (2019)).

A contract is not ambiguous merely because the parties do not agree on its meaning. *Fultz v. Shaffer*, 111 Md. App. 278, 299, 681 A.2d 568, 578 (1996). "Furthermore, 'simply because [a party] can point to several slightly different dictionary definitions of [a word] does not render that term ambiguous.'" *W.F. Gebhardt & Co., Inc.*, 250 Md. App. 652, 252 A.3d at 74 (quoting *Rigby v. Allstate Indem.*, 225 Md. App. 98, 110, 123 A.3d 592, 598-99 (2015)) (alterations in *W.F. Gebhardt & Co., Inc.*). A contract is ambiguous "'if, to a reasonable person, the language used is susceptible of more than one meaning or is of doubtful meaning.'" *Martz*, 35 F.4th at 225 (citation omitted); *see also Cochran*, 398 Md. at 17, 919 A.2d at 710; *Sy-Lene of Washington*, 376 Md. at 167, 829 A.2d at 547; *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999); *Calomiris v. Woods*, 353 Md. 425, 436, 727 A.2d 358, 363 (1999); *W.F. Gebhardt*, 250 Md. App. at 667, 252 A.3d at 74.

The determination of whether a contract is ambiguous is a question of law. *Towson Univ.*, 384 Md. at 78, 862 A.2d at 946; *Sy-Lene of Washington*, 376 Md. at 163, 829 A.2d at 544. Generally, "'ambiguities are resolved against the draftsman of the instrument.'" *John L. Mattingly Const. Co., Inc. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 334, 999 A.2d 1066, 1078 (2010).

To ascertain whether a contract is ambiguous, a court considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time" that they enter into the contract. *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985). But, "'[i]f only one reasonable meaning can be ascribed to the [contract] when viewed in context, that meaning necessarily reflects the parties' intent.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Labor Ready, Inc. v. Abis*, 137 Md. App. 116, 128, 767 A.2d 936, 942 (2001)).

"It is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris*, 353 Md. at 445, 727 A.2d at 368 (quoting *Canaras v. Lift Truck Servs*., 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443 *Table), 1992 WL 145269, at *5, 966 F.2d 1443 (4th Cir.1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck."). Therefore, a court may not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensel v. Winchester Constr. Co.*, 392 Md. 601, 624, 898 A.2d 472, 485 (2006).

Consideration of extrinsic evidence is unnecessary when a contract is unambiguous. *DIRECTV*, 376 Md. at 312, 829 A.2d at 630 (citations omitted); *see Clendenin Bros. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459, 889 A.2d 387, 393 (2006). Conversely, if the contract is ambiguous, "'the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract.'" *Cty. Commissioners of Charles Cty. v. St. Charles Associates Ltd. P'ship*, 366 Md. 426, 445, 784 A.2d 545, 556 (2001) (citation omitted); *accord John L. Mattingly Const. Co.*, 415 Md. at 327, 999 A.2d at 1074; *see Point's Reach Condominium Council of Unit Owners v. Point Homeowners Ass'n, Inc.*, 321 Md. 152, 582 A.2d 493, 495 (1990).

For example, if a contract is ambiguous, "'extrinsic evidence may be consulted to determine . . . whether the ambiguous language has a trade usage.'" *Mut. Fire Ins. Co. of Calvert Cty. v. Ackerman*, 162 Md. App. 1, 15, 872 A.2d 110, 118 (2005) (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 404, 488 A.2d 486, 497 (1985)); *see Della Ratta, Inc. v. Am. Better Cmty. Developers, Inc.*, 38 Md. App. 119, 130, 380 A.2d 627, 635 (1977). But, extrinsic evidence may "not be used to contradict other, unambiguous language." *Calomiris*, 353

Md. at 441, 727 A.2d at 366.  Moreover, the court may construe an ambiguous contract only "'if there is no factual dispute in the evidence.'"  *CB Structures, Inc. v. Potomac Electric Power Co.*, 122 F. Supp. 3d 247, 251 (D. Md. 2015) (citation omitted); *see also Chorley Entrs. v. Dickey's Barbecue Restaurants, Inc.*, 807 F.3d 553, 563 (4th Cir. 2015); *Pac. Indem. Co.*, 302 Md. at 389, 488 A.2d at 489.

### B. Principles of Statutory Interpretation

Generally, "[w]hen faced with a statutory provision, 'the starting point for any issue of statutory interpretation . . . is the language of the statute itself.'"  *Redeemed Christian Church of God (Victory Temple) Bowie, Maryland v. Prince George's County, Maryland*, 17 F.4th 497, 508 (4th Cir. 2021) (quoting *D.B. v. Cardall*, 826 F.3d 721, 734 (4th Cir. 2016)) (alteration in original); *see Murphy v. Smith*, ___ U.S. ___, 138 S. Ct. 784, 787 (2018) ("As always, we start with the specific statutory language in dispute."); *Williams v. Carvajal*, ___ F.4th ___, 2023 WL 2669652, at *3 (4th Cir. March 29, 2023) ("As always, an issue of statutory interpretation begins with the text.") (citing *McAdams v. Robinson*, 26 F.4th 149, 156 (4th Cir. 2022)); *Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 356 (4th Cir. 2020) ("'As in all statutory construction cases,' we start with the plain text of the provision.") (quoting *Marx v. General Revenue Corp.*, 568 U.S. 371, 376 (2013)); *United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020) ("When interpreting a statute, courts must 'first and foremost strive to implement congressional intent by examining the plain language of the statute.'") (quoting *United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010)); *see also United States v. Bryant*, 949 F.3d 168, 174-75 (4th Cir. 2020); *Ignacio v. United States*, 674 F.3d 252, 254 (4th Cir. 2012).

A statute "means what it says."  *Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016); *see United States v. Cohen*, ___ F.4th ___, 2023 WL 2564405, at *1 (4th Cir. Mar. 20, 2023).

"'[A]bsent ambiguity or a clearly expressed legislative intent to the contrary,'" courts apply the "plain" meaning" of the statute. *Abdelshafi*, 592 F.3d at 607 (quoting *United States v. Bell*, 5 F.3d 64, 68 (4th Cir.1993)). This is "determined by reference to its words' 'ordinary meaning at the time of the statute's enactment.'" *Abdelshafi*, 592 F.3d at 607 (quoting *United States v. Simmons*, 247 F.3d 118, 122 (4th Cir. 2001)). Moreover, "'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Gundy v. United States*, ___ U.S. ___, 139 S. Ct. 2116, 2126 (2019) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)).

Terms that are not defined are "'interpreted as taking their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted); accord *United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020). Courts may also consider a statute's history and purpose to give effect to its language. *See Gundy*, 139 S. Ct. at 2126. However, courts may "not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994); *see Raplee v. United States*, 842 F.3d 328, 332 (4th Cir. 2016) ("If the meaning of the text is plain . . . that meaning controls.").

The Fourth Circuit has instructed that, when interpreting a state statute, a federal court should "apply the statutory construction rules applied by the state's highest court." *In re DNA Ex Post Facto Issues*, 561 F.3d 294, 300 (4th Cir. 2009); *see Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489 (4th Cir. 2007). Maryland follows the general rules of statutory interpretation. *Johnson v. Mayor & City Council of Balt.*, 430 Md. 368, 377, 61 A.3d 33, 38 (2013).

In Maryland, the "'cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the General Assembly.'" *Conaway v. State*, 464 Md. 505, 523 212 A.3d

348, 358 (2017) (citation omitted); *see Deville v. State*, 383 Md. 217, 223, 858 A.2d 484, 487 (2004).  Courts first examine "'the plain meaning of the statutory language[.]'" *Johnson v. Mayor & City Counsil of Balt.*, 430 Md. 368, 377, 61 A.3d 33, 38 (citation omitted).  If the language "'is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, [the] inquiry is at an end.'"  *Id.* (citation omitted).  However, if the statute's "'language is ambiguous or unclear, [courts] seek to discern the intent of the legislature from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based.'"  *Id.* (citation omitted).

The statutory language "'must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute.'"  *In re J.C.N.*, 460 Md. 371, 391, 190 A.3d 329, 341 (2018) (citation omitted).  And, a court should strive to "avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense."  *Bellard v.* State, 452 Md. 467, 481-82, 157 A.3d 272, 280-81 (2017).

Moreover, the statute must be read "'as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.'"  *Conaway*, 464 Md. at 523, 212 A.3d at 358; *see Bourgeois v. Live Nation Ent's, Inc.*, 430 Md. 14, 27, 59 A.3d 509, 516 (2013).  As the Maryland Court of Appeals[4] has explained, courts may "'neither add nor delete

---

[4] In the general election held in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. And, the voters also approved changing the name of the State's intermediate appellate court, the Maryland Court of Special Appeals, to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland (Dec. 14, 2022), https://www.courts.state.md.us/media/news/2022/pr20221214#:~:text=Effective%20immediately %2C%20the% 20Court% 20of,the%20Appellate% 20Court% 20of% 20Maryland.

language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute.'" *McCloud v. Dep't of State Police, Handgun Permit Review Bd.*, 426 Md. 473, 480, 44 A.3d 993, 997 (2012) (citation omitted).

Dictionary definitions may provide a "'useful starting point'" to determine a term's meaning in common parlance. *Montgomery Cty. v. Deibler*, 423 Md. 54, 67, 21 A.3d 191, 198 (2011) (citation omitted); *see also Baltimore City Detention Center v. Foy,* 461 Md. 627, 645, 197 A.3d 1, 11 (2018); *Bottini v. Dep't of Fin.*, 450 Md. 177, 195, 147 A.3d 371, 382 (2016) (using dictionary definition to construe the meaning of the term "money" in a statute).   However, dictionary definitions are not necessarily dispositive.  *Deibler*, 423 Md. at 67, 31 A.3d at 198. And, when a court turns to a dictionary to clarify a statutory term, the court should endeavor to consult an edition that was extant at the time that the challenged statute was enacted. *Harvey v. Marshall*, 389 Md. 243, 260 n.11, 884 A.2d 1171, 1181 n.11 (2005).

## IV. Discussion

### A. MCDCA Claim (Count II)

In Count II, plaintiff alleges that defendants violated the Maryland Consumer Debt Collection Act by threatening to charge prejudgment interest that exceeded the legal interest rate of 6%, as established by Md. Const. Art. III, § 57, and by increasing Shadrin's rent without his affirmative consent. ECF 2, ¶¶ 33-37, 72-73, 75-76.

Defendants argue that the legal interest rate of 6% does not bind the parties, because plaintiff and defendants contracted for a prejudgment interest rate greater than 6%. ECF 13-1 at

---

To avoid confusion, I will refer to the names of the courts as they existed when the cited cases were decided.

11-12.[5] As to plaintiff's rent increase claim, defendants contend that the rent increased only upon conversion of the fixed lease term to a month-to-month term, and Shadrin was given sufficient notice of the increase. *Id.* at 13. Further, they argue that Maryland is not a rent control state, and therefore affirmative assent to a rent increase is not required. *Id.* at 12.

Plaintiff invokes C.L. § 14-202(8). ECF 2, ¶¶ 72, 73. Title 14 is called "Miscellaneous Consumer Protection Provisions." Subtitle 2 is called "Consumer Debt Collection."  Section 14-202 is titled:  "Certain acts prohibited."  Under § 14-202, "in collecting or attempting to collect an alleged debt a collector may not" . . .  "(8) Claim, attempt, or threaten to enforce a right with knowledge that the right does not exist."

To state a claim under C.L. § 14-202(8), a plaintiff "'must set forth factual allegations tending to establish two elements: (1) that Defendants did not possess the right to collect the amount of debt sought; and (2) that Defendants attempted to collect the debt knowing that they lacked the right to do so.'" *Healy v. BWW Law Group, LLC*, PWG-15-3688, 2017 WL 281997, at *5 (D. Md. Jan. 23, 2017) (quoting *Lewis v. McCabe Weisberg & Conway*, DKC 13-1561, 2014 WL 3845833, at *6 (D. Md. Aug. 4, 2014)).  Notably, "to adequately allege the requisite knowledge for purposes of [C.L. § 14-202(8)], a plaintiff must allege that the defendant either actually knew that it did not possess a right it claimed as part of its debt collection efforts, or recklessly disregarded the falsity of that claim." *Nationstar Mortg. LLC v. Kemp*, 476 Md. 149, 191, 258 A.3d 296 (2021).

"Maryland Courts have consistently interpreted the MCDCA to require plaintiffs to allege that defendants acted with knowledge that the 'debt was invalid, or acted with reckless disregard

---

[5] Defendants also contend that, in any event, the interest that was charged by HWI was "within dollars" of 6%.  ECF 13-1 at 12 n.10.

as to its validity.'" *Lembach v. Bierman*, 528 F. App'x 297, 304 (4th Cir. 2013) (quoting *Shah v. Collecto, Inc.*, DKC-2004-4059, 2005 WL 2216242, at *11 (D. Md. Sept. 12, 2005)). Indeed, the Maryland Court of Appeals has said that a "plaintiff may invoke § 14-202(8) when the amount claimed by the debt collector includes sums that the debt collector, to its knowledge, does not have the right to collect." *Chavis v. Blibaum & Assocs., P.A.*, 476 Md. 534, 264 A.3d 1254, 1270 (2021).

Count II contains two separate bases of liability under the MCDCA. I shall address each, in turn.

### 1.   Prejudgment Interest

Md. Const. Art. III, § 57 states: "The Legal Rate of Interest shall be Six per cent per annum, unless otherwise provided by the General Assembly."

Notably, "[p]rejudgment interest serves two purposes: first, it compensates [a party] for the loss of the use of his or her money; and, second, it forces the defendant to relinquish any benefit that it has received by retaining the plaintiff's money in the interim." *Brandywine Smyrna, Inc. v. Millennium Builders*, LLC, 34 A.3d 482, 486 (Del. 2011). Post judgment interest "is awarded to compensate a plaintiff for having been deprived of the value of principal losses from the time of judgment to the time that the plaintiff is actually paid. Thus, prejudgment and postjudgment interest serve exactly the same purpose, albeit for different time periods: they make the [party] whole for having been deprived of the use of the principal loss amount." *Becker Holding Corp. v. Becker*, 78 F.3d 514, 516 (11th Cir. 1996).

As discussed, in a letter to plaintiff on February 10, 2022, HWI allegedly sought to collect principal of $1,193.46 and prejudgment interest of $114.83.  According to plaintiff, this equated to an interest rate of 8%.  ECF 2, ¶¶ 32, 33.  And, plaintiff contends that defendants violated the

MCDCA by attempting to charge prejudgment interest at the rate of 8%. ECF 2, ¶¶ 37, 72.[6] In particular, plaintiff argues that the Lease provided for prejudgment interest at the highest rate allowed by law, and therefore the interest rate must be capped at the legal rate of 6%. ECF 2, ¶¶ 34, 35, 36; *see also* ECF 13-3 at 8.

Defendants argue that the legal rate of interest does not apply if the parties have otherwise agreed to a different interest rate. ECF 13-1 at 11-12.  And, they argue that the Lease does not limit defendants to interest at the rate of 6%.

The law is clear that the legal rate of prejudgment interest in Maryland is 6 %. *See*, *e.g., Dominion Financial Services, LLC v. Pavlovsky*, ___F.Supp.3d___, 2023 WL 3550011, at *15-16 (D. Md. May 18, 2023) (exercising discretion to award prejudgment interest of six percent per annum, in accordance with the legal rate of interest set forth in  Md. Const. Art. III, § 57); *Lighting Retrofit International, LLC v. Constellation NewEnergy, Inc*., SAG-19-02751, 2023 WL 2306962, at *13 (stating that Md. Const. Art. III § 57 "establish[es] the legal rate of interest in Maryland"). "Absent a contractual stipulation or a statute, the rate of prejudgment interest may not exceed the general legal rate of six percent." *Maryland Nat'l Bank v. Cummins*, 322 Md. 570, 600, 588 A.2d 1205, 1219 (1991).

However, "[w]hen the parties have agreed on a rate of interest, that agreement should be honored." *Wickersham Construction and Engineering, Inc. v. Town of Sudlersville, Maryland*, CCB-16-4087, 2020 WL 5642106, at *15 (D. Md. Sept. 22, 2020) (citing *Noyes Air Conditioning Contractors, Inc. v. Wilson Towers Ltd. P'ship*, 122 Md. App. 283, 293, 712 A.2d 126, 131

---

[6] As noted, defendants offer a calculation that indicates that the interest was not 8%. ECF 13-1 at 12 n. 8. However, plaintiff notes that the HWI Letter states that "[b]ecause of interest at the rate of 8.00%, the amount due on the day you pay may be greater . . . ." ECF 14-1 at 2; *see also* ECF 14 at 14-15.

(1998)).[7] Otherwise, prejudgment interest should "be calculated at the legal rate of six percent per annum." *Harford Cty. v. Saks Fifth Ave. Distribution Co.*, 399 Md. 73, 96 (2007) (citing Md. Const. Art. III, § 57); *see also Lighting Retrofit International, LLC*, 2023 WL 2306962, at *13 ("When prejudgment interest is mandatory, such interest accrues at the Maryland legal rate of six percent per annum . . . .").

The Lease states as follows, ECF 13-3 at 8:

44.   PREJUDGMENT INTEREST: If Resident violates this Lease Agreement and said violation results in a monetary loss to Management, then Management shall be entitled to prejudgment interest at the highest rate allowed by law, but in no event more than ten percent (10%) per annum, on the amount due Management, from the date the Management mails its written list of damages to Resident.

Defendants interpret the prejudgment interest provision as an agreement that entitles them "to charge prejudgment interest not exceeding 10 percent per annum." ECF 19 at 7. Therefore, defendants argue that, if the HWI Letter is construed as charging prejudgment interest at a rate of 8%, it is within the bounds of the Lease and the law. ECF 13-1 at 12; ECF 19 at 6-7.

As discussed at length, the court's responsibility is to ascertain the plain meaning of the Contract.  The provision plainly authorizes defendants to charge interest at the maximum rate allowed by law, but in no event more than 10%. In other words, if the maximum rate allowed by law were more than 10%, the cap is 10%.  But, the plain text of the provision does not allow defendants to charge whatever sum they choose, so long as it does not exceed 10%.

Here, the parties contracted for the maximum amount of prejudgment interest allowed by law.  But, they did not stipulate to a higher rate. Thus, the Court's inquiry could end here.

---

[7]  Plaintiff argues that *Noyes* is unavailing because the parties in that case were "'experienced business enterprises fully aware of the terms of their contract.'" ECF 14 at 13 (quoting *Noyes*, 122 Md. App. at 294, 712 A.2d at 131). Defendant claims that Shadrin is a landlord, and thus is sophisticated for the purposes of executing the Lease. ECF 13-4.  But, at this juncture, the Court cannot make such a determination.

The case of *Elhab, LLC v. Mengesha*, PWG-20-2533, 2021 WL 4197457 (D. Md. Sept. 14, 2021), provides guidance. There, the court ruled on a motion for default judgment with respect to two promissory notes.[8] The first promissory note provided that the "unpaid principal would be subject to interest at 7.0% per annum." *Id.* at *2. The second promissory note indicated that "[a]ny amount unpaid by the due date was subject to interest 'at a rate equivalent to the maximum rate of interest permitted by laws.'" *Id.* at *3. The court permitted an interest rate of 7% on the first note, as agreed by the parties. *Id.* But, in awarding prejudgment interest on the second note at 6% per annum, the court looked to Maryland Const. Art. III, § 57. *Elhab, LLC*, 2021 WL 4197457, at *3 n. 2.

The provision providing for prejudgment interest here clearly calls for "prejudgment interest at the highest rate allowed by law." This is an agreement between the parties for prejudgment interest at a rate of 6%. ECF 13-3 at 8.

Defendants rely on *Cummins*, 322 Md. 570, 588 A.2d 1205, for the proposition that the prejudgment interest provision in the Lease permits an interest rate greater than 6%. However, plaintiff maintains that the language in *Cummins*, 322 Md. at 600, 588 A.2d at 1219, which would permit a contractual stipulation to supersede the legal rate of interest, is merely *dicta*.

Plaintiff also argues that the Maryland Court of Appeals's decision in *United Cable Television of Baltimore Ltd. Partnership v. Burch*, 354 Md. 658, 732 A.2d 887 (1999), undermines *Cummins*, 322 Md. at 600, 588 A.2d at 1219. In his view, *United Cable* set a limitation on interest generally, even if the parties stipulate to a rate of prejudgment interest. ECF 14 at 11-13.

---

[8] "A 'promissory note is, as between the parties to it, a contract, to which the basic rules of contract construction apply.'" *Krus v. Krus*, GLR-20-740, 2021 WL 2474397, at *4 (D. Md. June 16, 2021) (quoting *Jenkins v. Karlton*, 329 Md. 510, 525, 620 A.2d 894, 901 (Md. 1993)).

Specifically, plaintiff cites to the following paragraph, *United Cable*, 354 Md. at 683, 732 A.2d at 900 (emphasis added):

> The constitutionalized public policy of Maryland remains **that the legal rate of interest is six percent** and that, **if any changes in that rate are to be made, they are to be made by the General Assembly**. Inasmuch as damages for breach of a contract to pay money are pegged to the lawful rate of interest, a change in that common law rule of damages, absent a statutory basis, would have the same effect as judicially changing the Constitution or as judicially enacting a statute that has not been enacted by the General Assembly.

*United Cable* concerned a cable provider that charged its customers a monthly late fee of five dollars.  *See United Cable*, 354 Md. at 662, 732 A.2d at 889. The cable provider argued that the five dollar late charge was a permissible liquidated damages provision. *Id.* The court determined that a cable subscriber has "a contract to pay money, damages for the breach of which are the principal balance due, with lawful interest."  *United Cable*, 354 Md. at 662, 732 A.2d at 889.  And, the court stated that "there is no statute that authorizes or regulates United's late charges so that United's late charge remains subject to the common law rule." *Id.* at 681, 732 A.2d at 899. Because  no statute provided to the contrary, the court concluded that, under Article III, § 57, of the Maryland Constitution, six per cent per annum "is that rate by which United's liquidated damages provision must be measured."  *Id.* at 675, 732 A.2d at 896; *see Dua v. Comcast Cable of Maryland, Inc.*, 370 Md. 604, 612, 805 A.2d 1061, 1066 (2002) (explaining the holding in *United Cable*).

Following a review of Maryland cases and other authorities, the *United Cable* Court determined that, under the common law in Maryland, when money is not paid by a specified date in an agreement "'for the payment of a definite sum of money[,] *the measure of damages* is the amount of money promised to be paid, with legal interest.'"  *United Cable*, 354 Md. at 669, 732 A.2d at 893 (alteration and emphasis in *United Cable*) (quoting 1 J.P. Poe, *Pleading and Practice in the Courts of Law in Maryland* § 584C, at 608 (5th Tiffany ed. 1925) (Poe)); *see Dua*, 370 Md.

at 612, 805 A.2d at 1066. Because the late fee exceeded the legal rate of interest of 6%, the Court concluded that it constituted an unenforceable penalty. *United Cable*, 354 Md at 685, 732 A.2d at 901.[9]

Significantly, the *United Cable* Court only discussed prejudgment interest in passing when it detailed the development of the common law rule as is relevant to the measure of damages resulting from late payments. And, the dispute in *United Cable* did not involve an allegedly excessive prejudgment interest rate. But, the *United Cable* Court affirmed the award of prejudgment interest, *United Cable,* 354 Md. at 688, 732 A.2d at 903, "calculated at six percent per annum." *Id.* at 66, 732 A.2d at 891.

"Ch. 59 of the Acts of 2000 was a legislative response to the [*United Cable*] decision, and, in that statute, the Legislature for the first time enacted statutory provisions regulating late fees in contracts like those involved in [*United Cable*]." *Dua*, 370 Md. at 613, 805 A.2d at 1066. This statute provides that a late fee is neither interest nor a penalty, if it is no greater than 10% per month, subject to certain conditions. *See* C.L. § 14-1315. As the Maryland Court of Appeals has noted, C.L. § 14-1315 superseded the *United Cable* Court's holding that "that late fees in excess of 6% per annum violate Maryland common law." *Simpkins v. Ford Motor Credit Co*., 389 Md. 426, 429, 886 A.2d 126, 128 n. 3 (2005); ECF 19 at 6-7 n. 7.

In any event, nothing in *United Cable* indicates that the court intended to overrule *Cummins*. In fact, in asserting that the "constitutional provision sets the legal rate of interest," 354

---

[9] C.L. § 12–103(e)(1) provides for "no limitation on interest" for "certain commercial loans." *United Cable,* 354 Md. at 684, 732 A.2d at 901; ECF 14 at 13. The *United Cable* Court declined to apply its ruling to consumer loan transactions, "because there is no rate of interest in which the damages are tethered." *Id.* And, the court stated, *id.*: "If liquidated damages payable by consumers on contracts for the payment of money are to be treated the same as liquidated damages payable by commercial promisors on contracts to pay money, that change in policy should be made by the General Assembly." *United Cable,* 354 Md. at 684, 732 A.2d at 901.

Md. at 675, 732 A.2d at 896, the *United Cable* Court cited to *Cummins*, 322 Md. at 599–600, 588 A.2d at 1219, *see United Cable*, 354 Md. at 675, 732 A.2d at 896.  There, the Maryland Court of Appeals stated, 322 Md. at 600: "Absent a contractual stipulation or a statute, the rate of prejudgment interest may not exceed the general legal rate of six percent."

Indeed, several courts have relied on *Cummins* for the proposition that an agreement as to prejudgment interest trumps the legal rate. *See, e.g., Chase Home Finance LLC v. Maalouf*, WGC-07-1645, 2009 WL 10701991, at *19 (D. Md. Mar. 25, 2009), *aff'd,* 376 Fed. Appx. 328 (4th Cir. 2010) (per curiam); *Baker's Exp., LLC v. Arrowpoint Capital Corp.*, ELH–10–2508, 2012 WL 4370265, at *26 (D. Md. Sept. 20, 2012); *see also NCO Financial Systems, Inc. v. Montgomery Park, LLC*, 40 F.4th 123, 128 (4th Cir. 2022); *MLT Enterprises, Inc. v. Miller*, 115 Md. App. 661, 678, 694 A.2d 497, 505 (1997), *cert. denied,* 347 Md. 154, 699 A.2d 1168 (1997).  Moreover, "prejudgment interest is appropriate to rectify the 'creditor of the use of a fixed amount as of a known date.'" *Championship Tournaments, LLC v. U.S. Youth Soccer, Ass'n, Inc.*, SAG-18-2580, 2022 WL 1002137, *3 (D. Md. Apr. 4, 2022) (quoting *Buxton v. Buxton*, 363 Md. 634, 770 A.2d 152, 165 (2001)).

But, the issue here is one of contractual interpretation.  As stated, the plain text of the Lease provides for prejudgment interest at the maximum rate allowed by law, but no more than 10%.

Plaintiff also contends that the Maryland General Assembly has made clear that a 6% cap on prejudgment interest with respect to landlord-tenant agreements is adequate. ECF 14 at 14. Plaintiff cites *Ben-Davies v. Blibaum & Associates, P.A.*, 457 Md. 228, 177 A.3d 681 (2018), in support of his argument.

Case 1:22-cv-03228-ELH   Document 20   Filed 07/19/23   Page 30 of 48

*Ben-Davies* originated in federal court in the District of Maryland. There, Judge Motz, to whom several related cases were assigned,[10] certified the following question to the Maryland Court of Appeals:

> "Is the legal rate of post-judgment interest on a judgment awarded in a breach of contract action where the underlying contract is a residential lease ten percent (10%) as stated in Md. Cts & Jud Proc. § 11–107(a) or is it six percent (6%) as stated in Md. Cts & Jud Proc. § 11–107(b), which states that it is applicable to "a money judgment for rent of residential premises," where the judgment in the breach of contract action does not specifically delineate what portion, if any, of the judgment was awarded for unpaid rent?"

*Ben-Davies v. Blibaum & Associates, P.A.*, CCB-16-2783, ECF 20 (D. Md. Aug. 3, 2017); *Moore v. Blibaum & Associates, P.A.*, CCB-16-3546, ECF 24 (D. Md. Aug. 3, 2017) (the "Amended Certification Order").

The Maryland Court of Appeals recognized that, unless otherwise provided, under § 11-107(a) of the Courts and Judicial Proceedings Article ("C.J.") of the Maryland Code, a post-judgment interest rate of 10% applies to all judgments. *Ben-Davies*, 457 Md. at 230-31, 177 A.3d at 682. However, "where a landlord sues a tenant for breach of contract based on a residential lease, and the trial court enters judgment in the landlord's favor against the tenant and the judgment includes unpaid rent and other expenses, a post-judgment interest rate of 6% applies pursuant to C.J. § 11–107(b)." *Id.* at 275, 177 A.3d at 709.

Here, the prejudgment interest provision in the Lease states that management is entitled to "prejudgment interest at the highest rate allowed by law, but in no event more than ten percent (10%) per annum." ECF 13-3 at 8. The maximum rate of prejudgment interest allowed by law is 6% per annum. Indeed, the Maryland Court of Appeals has said that "[f]ailure to ***set*** the rate of

---

[10] The cases were subsequently reassigned to Judge Catherine Blake.

interest simply means that the rate runs at the legal rate." *Crystal v. West & Callahan, Inc.*, 328 Md. 318, 342, 614 A.2d 560, 572 (1992) (emphasis added).

Accordingly, defendant's Motion is denied as to the prejudgment interest component of plaintiff's MDCA claim.  The Lease clearly provides for a prejudgment interest rate at the legal rate, *i.e.*, 6%.

### 2.   Rent Increase

Plaintiff contends that defendants violated the MCDCA by attempting to increase the rent for the month-to-month renewal. ECF 2, ¶ 73.  He argues that defendants' rent increase constituted a new agreement that required his assent. Plaintiff states, ECF 14 at 20: "Landlord Defendants necessarily rely on the formation of a new contract for their entitlement to increased rent."

According to defendants, Maryland is not a "rent control state," and landlords are entitled to raise rents. ECF 13-1 at 12.  Moreover, they claim that plaintiff "was not blindsided, tricked, or oblivious to the fact that he had to make a decision two months prior to expiration of the Lease and notify the CRC Defendants in writing of his intention."  ECF 13-1 at 15.

As discussed, the Lease includes an Addendum, titled "Automatic Renewal Of Lease." ECF 13-3 at 16.  It states that the Lease "shall continue from month to month after its expiration, *subject to the same covenants, agreements, rules and regulations as are set forth in the Lease*," unless Management mails to Resident or Resident mails to Management written notice . . . , at least two (2) months prior to the expiration date [of the tenancy] . . . [the] intention not renew the Lease." *Id.* (emphasis added).

The automatic renewal provision also states, ECF 13-3 at 16 (emphasis added):

> If Management mails a notice to the Resident of its intention to terminate the then existing Lease term, and in said notice offers the Resident a new Lease term pursuant to the terms and conditions therein contained, and *if the Resident does not otherwise notify* Management (in accordance with section 18 of the Lease

Agreement) *within fifteen (15) days* of the mailing of the Management's notice of the Resident's intent not to renew the Lease, the *Resident shall be considered* as Resident *under the terms and conditions specified* in Management's notice.

Thus, the Addendum provides a right to the tenant to give notice of intent not to renew. Such notice is due at least two months prior to the expiration of the Lease. But, if the tenant does not terminate, the tenant would be subject to any new lease terms. And, in effect, under the automatic renewal provision, if a tenant remains silent for at least fifteen days after being notified of the landlord's intent to terminate and the offer of new lease terms, then the tenant is deemed to have agreed to the new terms and conditions.

The parties agree that the April 2020 Letter was not a notice from the landlord of intent to terminate the Lease. ECF 13-1 at 5; ECF 2, ¶¶ 22-23. However, the parties' agreement on this point does not make it necessarily so. *See In re Deepwater Horizon*, 753 F.3d 516, 520 (5th Cir. 2014) (Clement, J., dissenting) ("Even with the assent of all parties, judges still have the obligation to reject stipulations that are not factually true.").

Notably, the Lease does not specify particular words that must be used to constitute a notice of intent to terminate the Lease. And, the April 2020 Letter has indicia of a notice of intent to terminate the Lease. It stated: "As your current lease term will end on July 19, 2020, we would like to offer you a new lease . . . ." ECF 13-5. Thus, the April 2020 Letter made clear that the Lease would terminate on July 19, 2020. Moreover, the April 2020 Letter unambiguously provided for new terms, including an increase in month-to-month rent, which would go into effect upon the expiration of the existing term. *Id.* This certainly suggests that the prior terms would not remain in effect. The April 2020 Letter also said: "Notice of renewal or intent to vacate will need to be completed by 05/20/2020. . . ." *Id.*

Nonetheless, given the parties' joint position, I shall assume, *arguendo*, that the April 2020 Letter was not a notice of intent to terminate. To the extent that the parties contemplated the option

of acceptance by silence, it was only in the context of a notice to terminate, coupled with a proposal of new terms.  Apart from a notice to terminate, the Lease does not address acceptance by silence.

"Creation of a contract requires an offer by one party and acceptance by the other party." *Cochran v. Norkunas*, 398 Md. 1, 23, 919 A.2d 700, 713 (2007). "Acceptance of an offer is requisite to contract formation, and common to all manifestations of acceptance is a demonstration that the parties had an actual meeting of the minds regarding contract formation." *Id*. "[I]n other words, to establish a contract the minds of the parties must be in agreement as to its terms." *Mitchell v. AARP Life Ins. Program, New York Life Ins. Co.*, 140 Md. App. 102, 117, 779 A.2d 1061, 1069 (2001) (internal quotation marks and citation omitted). Thus, mutual assent is an integral component of every contract. *See, e.g., Joseph Saveri Law Firm Inc. v. Michael E. Criden, P.A*., 759 F'Appx. 170, 173 (4th Cir. 2019) (recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a contract); *Cochran*, 398 Md. at 14, 919 A.2d at 708; *Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC*, 421 Md. 94, 122, 25 A.3d 967, 983 (2011); *Advance Telecom Process LLC v. DSFederal, Inc*., 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).  Therefore, "[t]o modify a contract, both parties must assent to a particular change." *Geppi v. Pineau*, 2021 WL 3046846, at *5 (Md. Ct. Spec. App. July 20, 2021) (citing *Allstate Ins. Co. v. Stinebaugh*, 374 Md. 631, 650, 824 A.2d 87, 98-99 (2003)).

In *Graves v. Peterson*, 2017 WL 2645603, at *3 (Md. Ct. Spec. App. June 20, 2017), the Maryland Court of Special Appeals explained (emphasis added):

> After presuming the truth of the facts alleged in the complaint and viewing all reasonable inferences in a light most favorable to Mr. Graves, *see Pittway Corp. v. Collins*, 409 Md. 218, 234[, 973 A.2d 771, 780-81] (2009), we conclude that he failed to establish that the appellees had agreed to any of the terms contained in the Notice. Silence is not acquiescence—a contract requires an actual meeting of the minds, an offer and an acceptance. *Silence is not an acceptance of an offer unless the parties have agreed previously that silence would be an acceptance, the offeree has taken the benefit of the offer, or, based on previous dealings between the*

*parties, it is reasonable that the offeree should notify the offeror if she does not intend to accept. See Cochran*, 398 Md. at 23–24[,919 A.2d at 713-14]. None of those exceptions applied here. Mr. Graves did not allege the existence of any previous agreements regarding the manifestation of acceptance between the parties. The Notice did not convey a benefit to the appellees that they were able to retain as a result of their silence. And there was no course of dealing that would make it reasonable for the appellees to believe they would have to notify Mr. Graves if they intended not to accept his demand. To the contrary, this sort of unilaterally springing contract formation would circumvent the "acceptance" half of the contract formation process, and the court correctly dismissed Mr. Graves's claim for specific performance.

Shadrin argues that by virtue of his leaving at the end of the rental term, he did not receive a benefit of an extension of the Lease. ECF 14 at 21. Moreover, as to prior dealings, Shadrin alleges that, at the time he entered into the Lease, he orally notified the defendants at the outset of the tenancy that he would not be renewing the Lease.  ECF 14 at 21*; see also* ECF 2, ¶ 19.[11]  And, as noted, the Lease does not expressly provide for acceptance by silence, except in connection with the landlord's notice to terminate.  Therefore, plaintiff insists that, under the facts of the case, his silence cannot be construed as an acceptance of the new Lease terms.

At this stage of the proceedings, I cannot determine whether Shadrin's silence constituted acceptance of the increased rent. Plaintiff's claim that defendants increased Shadrin's rent without a contractual basis to do so remains viable at this juncture. Accordingly, I shall deny the Motion as to plaintiff's claim that the rent increase violated the MCDCA.

### B.  R.P. § 8-208(g) (Count IV)[12]

Count IV implicates various provisions of the Real Property Article of the Maryland Code.

---

[11] Plaintiff does not identify any facts to support his self-serving assertion.  And, the written terms of the Lease would likely prevail with respect to an oral assertion to the contrary.

[12] I discuss Count IV prior to discussion of Count III because the viability of Count III depends, in part, on whether Count IV survives the Motion.

R.P. § 8-208(g)(1) provides: "Any lease provision which is prohibited by terms of this section shall be unenforceable by the landlord."  In R.P. § 8-208(g)(2), it states: "If the landlord includes in any lease a provision prohibited by this section or made unenforceable by § 8–105 of this title or § 8–203 of this subtitle . . .  and tenders a lease containing such a provision or attempts to enforce or makes known to the tenant an intent to enforce any such provision, the tenant may recover any actual damages incurred as a reason thereof, including reasonable attorney's fees."

R.P. § 8-208(e)(1) provides:

Except for a lease containing an automatic renewal period of 1 month or less, a lease that contains a provision calling for an automatic renewal of the lease term unless prior notice is given by the party or parties seeking to terminate the lease, shall have the provision distinctly set apart from any other provision of the lease and provide a space for the written acknowledgment of the tenant's agreement to the automatic renewal provision.

In R.P. § 8-208(e)(2), it states:

An automatic renewal provision that is not specifically accompanied by either the tenant's initials, signature, or witnessed mark is unenforceable by the landlord.

In Count IV, plaintiff contends that defendants violated R.P. § 8-208(g)(2) by attempting to enforce the automatic renewal clause. ECF 2, ¶¶ 106, 107. Specifically, plaintiff claims that the renewal clause in the Addendum is unenforceable under R.P. § 8-208(g)(1) because "it was accompanied by and incorporated with" a second distinct Lease provision, in violation of § 8-208(e)(1). ECF 2, ¶ 104.  Plaintiff also asserts that the automatic renewal provision is unenforceable because it was not "specifically accompanied by the tenant's initials or signature . . . ." *Id.* ¶ 105; *see* R.P. § 8-208(e)(2).

In the Complaint, plaintiff used a bold and italicized font, ECF 2, ¶ 11, to distinguish the provisions in the Lease that were combined.  He states, *id.*:

The tenancy created under the Lease (including any renewal or extension of this tenancy) shall continue from month to month after its expiration, subject to the same covenants, agreements, rules and regulations as are set forth in the Lease,

35

unless management mails to Resident or Resident mails to Management written notice (sent in accordance with Section No. 18 of the Lease Agreement), at least two (2) months prior to the expiration date of the then existing term, of said Management's or Resident's intention not to renew the Lease. *If Management mails a notice to the Resident of its intention to terminate the then existing Lease term, and in said notice offers the Resident a new Lease term pursuant to the terms and conditions therein contained, and if the Resident does not otherwise notify Management (in accordance with section 18 of the Lease Agreement) within 15 days of the mailing of the Management's notice of the Resident's intent not to renew the Lease, the Resident shall be considered as Resident under the term  and conditions specified in Management's notice.*

Defendants argue that plaintiff "invites this Court to ignore both the statutory exception clearly set forth at the beginning of R.P. § 8-208(e)(1) and the conspicuous one-month term of renewal stated in the Automatic Renewal Provision in order to find a violation that does not exist." ECF 13-1 at 9. Further, defendants contend that plaintiff has not pleaded that the second provision constitutes a separate provision within the meaning of  R.P. § 8-208(e)(1). *Id.* at 9 n. 8.

As a threshold matter, the question is whether the Lease's renewal provision constitutes "an automatic renewal period of 1 month or less." R.P. § 8-208(e)(1). If so, the renewal provision may be combined with an additional provision, without violation of R.P. § 8-208(g) and R.P. § 8-208(e)(1).

Defendants argue that the renewal provision is for a one-month term. ECF 13-1 at 9. In the Opposition, plaintiff argues that "the renewal clause is not for one month or less, but rather, it is for a month-to-month lease, terminable on 2 months' notice." ECF 14 at 7.

The renewal provision states that, under certain circumstances, the tenancy continues "from *month to month* after its expiration. . . ." ECF 13-3 at 16 (emphasis added). "Generally, 'month to month' in leases and other contracts means that either party can terminate the contract upon one month's notice." *Bessette v. Weitz*, 148 Md. App. 215, 237, 811 A.2d 812, 824 (2002). However, although the Lease states that it continues "from month to month," the tenant must provide 60 days' notice to terminate the Lease. ECF 13-3 at 16. Therefore, depending on when such

termination notice is provided, the Lease would not be extended, or it could be extended for one additional month, or the tenant could be bound for an additional two months.

Here, the Lease was to expire on July 19, 2020.  On June 18, 2020, plaintiff gave notice of his intent to terminate.  ECF 2, ¶ 27.  Plaintiff believed the notice was effective as of July 19, 2020. *Id.* However, based on the terms of the Lease, to which plaintiff had agreed, two months' notice was required to terminate the Lease.  Thus, Continental determined that the end date was August 19, 2020 (ECF 13-7), *i.e.*, one month beyond the original end date of the Lease.

As the parties discuss, the statute is phrased to except from the requirements of R.P. § 8-208(e)(1) "a lease containing an automatic renewal ***period*** of 1 month or less . . . ."  But, "automatic renewal period" is not defined in the statute.  Defendants argue that the Lease's renewal provision falls within the statutory renewal period, as the Lease is extended by a single month at a time. ECF 13-1 at 9. Plaintiff argues, however, that the statute refers to a "term" when pertaining to the length of a lease.  ECF 14 at 16.  *See*, *e.g.*, R.P. § 8-203(i)(11); R.P. § 8-207(a); R.P. § 8-210(b)(3).  In contrast, argues plaintiff, the statute generally uses the word "'period'" to "refer to other lengths of time than the term of a lease."  ECF 14 at 16.  *See*, *e.g*, R.P. § 8-208(d)(5); R.P. § 8-211(h); R.P. § 8-203.1; *but see* R.P. § 8-211(k)(3); R.P. § 8-208(d)(3).

In plaintiff's view,  the word "period" does not cover the automatic renewal of a lease term on a month-to-month basis. ECF 14 at 15-18. Rather, plaintiff suggests that the meaning of the word "period" in the exemption indicates the total time that a tenant is under contract pursuant to an automatic renewal provision. R.P. § 8-208(e)(1). ECF 14 at 16. In other words, because there is potential for a tenant to be bound for more than 30 days under the automatic renewal provision, he argues that the statutory exception does not apply.

Here, the renewal clause contains two arguably distinct provisions. The first calls for automatic renewal on a month-to-month basis in the absence of a notice of intent not to renew. ECF 13-3 at 16. The second governs the conditions that give rise to a new lease upon management's notice of intent to terminate the existing Lease. *Id.* The two provisions are possibly interrelated but also arguably distinct.  If they are distinct, they can be combined in one provision only if the automatic renewal period is for one month or less.

As I see it, the Lease is ambiguous as to the whether the "month to month"  time frame constitutes an "automatic renewal period of 1 month or less." R.P. § 8-208(e)(1).  Despite use of the words "month to month," the Lease also requires two months' notice of intent to terminate.  As a result, a tenant could face a two-month extension of the Lease, depending on when notice to terminate is provided.

"[G]enerally 'the construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim.'" *Butz v. Pulte Home Corp.*, PX-16-1508, 2017 WL 679226, at *4 (D. Md. Feb. 21, 2017) (quoting *Martin Marietta Corp. v. Int'l Telecomms. Satellite Org.*, 978 F.2d 140, 143 (4th Cir. 1992)).  In the context of a motion to dismiss, "[i]f a [contract] term is ambiguous,[] the Court may not resolve the ambiguity on a motion to dismiss." *Allen v. General Star Indem. Co.*, WDQ-11-1826, 2012 WL 764418, at *6 (D. Md. Mar. 6, 2012); *see also Key Tidewater Ventures LLC v. PNC Bank, N.A.*, JKB-14-2170, 2014 WL 5306716, at *5 (D. Md. Oct. 15, 2014) ("[T]he contract is not so clear and unambiguous such that the Court can dismiss Plaintiff's claims as a matter of law at this early stage of litigation."); *Aloi v. Moroso Inv. Partners*, LLC, DKC 11–2591, 2012 WL 434174, at *9 (D. Md. Sept. 20, 2012) ("'The construction of a contract is a question of fact which, if disputed, is not susceptible

of resolution under a motion to dismiss for failure to state a claim'") (quoting *Wolman v. Tose*, 467 F.2d 29, 34 (4th Cir.1972)).

In my view, dismissal of Count IV is not warranted, because it is premature to decide whether the statutory exemption is applicable.

### 3.   MCPA Claim (Count III)

In Count III, plaintiff contends that defendants violated the MCPA by virtue of their violation of the MCDCA, as discussed in Count II. ECF 2, ¶¶ 83-87, 96-97. Plaintiff also argues that the conduct alleged in Count IV constitutes a violation of the MCPA. *Id.* ¶¶ 89-91.

In particular, plaintiff asserts an unfair trade practice based on the combination in the Lease of the month-to-month automatic renewal provision with the "new terms provision." He asserts that the combination of provisions violates R.P. § 8-208(e)(1) and constitutes an MCPA violation. *Id.* ¶¶ 87-94.  In addition, he asserts that the "new terms provision," by itself, violates the MCPA.

As discussed, the Lease contains an addendum titled "Automatic Renewal Of Lease."  ECF 13-3 at 16.  It includes the automatic renewal provision, which requires a tenant to provide written notice of an intent not to renew, due two months prior to expiration of the Lease term. *See* ECF 13-3 at 16 (requiring notice to be sent two months in advance and in accordance with section 18); *id.* at 6 (requiring notice to be sent by certified mail).  It also includes the so called new terms provision, discussed earlier, which states, *id.*:

> If Management mails a notice to the Resident of its intention to terminate the then existing Lease term, and in said notice offers the Resident a new Lease term pursuant to the terms and conditions therein contained, and if the Resident does not otherwise notify Management (in accordance with section 18 of the Lease Agreement) within 15 days of the mailing of the Management's notice of the Resident's intent not to renew the Lease, the Resident shall be considered as Resident under the term and conditions specified in Management's notice.

According to plaintiff, the combination of the two distinct terms in one addendum has harmed him. ECF 2, ¶ 39.[13]  He contends that the defendants attempted to enforce the unlawful automatic renewal provision. *Id.* ¶¶ 106, 107.  Yet, Shadrin states that, on the day he entered into the Lease, he orally notified defendants that he would not renew the Lease. *Id.* ¶ 19.[14]  Moreover, he asserts that the combination of the automatic renewal provision and the "new terms provision" is "contrary to public policy," *id.* ¶ 91, and "a violation of public policy provides additional evidence of the degree of consumer injury." *Id.* ¶ 88.

Defendants counter that plaintiff's claims as to Count II and IV fail, and thus they may not support a theory of liability under the MCPA. ECF 13-1 at 13-14. As to whether the "new terms provision" violates the MCPA, defendants maintain that because they did not issue a notice of intent to terminate the Lease in combination with new Lease terms, plaintiff lacks standing because he cannot establish injury. ECF 13-1 at 14-15.

"To plead a standalone claim under the MCPA, a consumer must allege '(1) an unfair or deceptive practice or misrepresentation that is (2) relied upon, and (3) causes them actual injury.'" *Alexander v. Carrington Mortgage Services, LLC*, 23 F.4th 370, 380 (4th Cir. 2022) (quoting *Stewart v. Bierman*, 859 F. Supp. 2d 754, 768 (D. Md. 2012)) (internal citation omitted).  "A violation of the Maryland Consumer Debt Collection Act is a per se violation of the Maryland Consumer Protection Act." *Smith v. Westminster Management, LLC*, 2023 WL 2344304, at *19 (Appellate Court of Maryland, Mar. 3, 2023); *see also* C.L. § 13-301(14)(iii).

---

[13] ECF 2, ¶ 39 appears to incompletely recount Shadrin's claim of damages. It states that Shadrin was damaged "because of the improper new lease term and the excessive interest and." It appears that Shadrin intended to add another basis for his allegation.

[14] As discussed earlier, the validity of such oral notice is not addressed by plaintiff.

If defendants' conduct in attempting to charge prejudgment interest in excess of the legal rate, as well as the rent increase, amount to violations of C.L. §§ 14-202(8), *i.e.*, the MCDCA,  the conduct would also violate the MCPA.  As discussed, plaintiff has stated MCDCA claims on these grounds.  Therefore, he has also stated a claim under the MCPA as to these same allegations.

I turn next to the claim of a MCPA violation based on the combined terms in the Addendum.

The MCPA prohibits certain "unfair or deceptive trade practices." C.L. § 13-301. Further, the MCPA makes it unlawful for a person to use unfair or deceptive trade practices related to the extension of consumer credit or the collection of consumer debts. C.L. § 13-303(4)-(5); *see Piotrowski v. Wells Fargo Bank, N.A.*, DKC-11-3758, 2013 WL 247549, at *10 (D. Md. Jan. 22, 2013).

The statute defines an unfair or deceptive trade practice, *inter alia*, as: "False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;" and "Failure to state a material fact if the failure deceives or tends to deceive." C.L. § 13-301(1), (3); *see Marshall v. James B. Nutter & Co.*,  816 F. Supp. 2d 259, 266 (D. Md. 2011) (explaining that "the MCPA prohibits both the use of false or misleading statements and also the omission of material facts"); *see also Rich Morton's Glen Burnie Lincoln Mercury, LLC v. Williams-Moore*, 2023 WL 166277, at *5 (App. Ct. Md. Jan 12, 2023) ("[W]hether a statement is misleading under the MCPA is adjudged from the point of view of a reasonable, but unsophisticated, consumer.). And, "[a] plaintiff must identify a trade 'practice' that is unfair, abusive, or deceptive." *Peters v. Best Buy Stores, L.P.*, DKC 20-2007, 2022 WL 622304, at *6 (D. Md. Mar. 3, 2022) (quoting *Hibdon v. Safeguard Properties, LLC*, PJM 14–591, 2015 WL 4249525, at *7 (D. Md. July 9,

2015)); see *also Wheeling v. Selene Financial LP*, 473 Md. 356, 388, 250 A.3d 197, 216 (2021) ("Section 13-303 of the MCPA generally prohibits unfair, abusive, or deceptive trade practices, and § 13-301 of the Act contains a nonexclusive list of practices that are defined to be unfair, abusive, or deceptive.").

Plaintiff does not argue that he was deceived as to the Lease's terms or fraudulently induced into signing the Lease. Moreover, the failure to read the entirety of a contract is not grounds for a claim under the MCPA. *Bank of Am., N.A. v. Jill P. Mitchell Living Trust*, 822 F. Supp. 2d 505, 536 (D. Md. 2011) (finding that the "willful blindness" of a consumer cannot give rise to a cause of action under the MCPA). Instead, plaintiff's MCPA claims as they pertain to the Lease rest on whether defendants engaged in an unfair trade practice. Indeed, plaintiff complains that the combination of the automatic renewal provision with the new terms provision is an unfair trade practice that violates public policy. ECF 2, ¶¶ 88, 91.

As noted, any claim under the MCPA requires an "actual injury." *Turner v. J.P. Morgan Chase, N.A.*, TDC-14-0576, 2015 WL 5021390, at *4 (D. Md. Aug. 21, 2015) (citing *Currie v. Wells Fargo Bank, N.A.*, 950 F. Supp. 2d 788, 796 (D. Md. 2013)); *see also Moore v. RealPage Utility Management Inc.*, PX-20927, 2023 WL 2599571, at *2 (D. Md. Mar 22, 2023) ("To sustain the statutory causes of action [under the MCPA], a plaintiff must aver 'actual damages' arising from the statutory violations.") (quoting *Assanah-Carroll v. Law Offices of Edward J. Maher, P.C.*, 480 Md. 394, 415, 281 A.3d 72, 84 (2022)). In *Citaramanis v. Hallowell*, 328 Md. 142, 151, 613 A.2d 964, 968 (1992), the Maryland Court of Appeals emphasized that because the MCPA's private right of action is limited to recovery for "injury or loss sustained," C.L. § 13–408, a "plaintiff pursuing a private action under the MCPA [must] prove actual 'injury or loss sustained'"

in order to prevail. *Id*. at 151, 613 A.2d at 968 (citation omitted); *accord McDaniel v. Baranowski*, 419 Md. 560, 587–88, 19 A.3d 927, 943 (2011).

The case of *Lloyd v. Gen. Motors Corp.,* 397 Md. 108, 916 A.2d 257 (2007), is instructive. There, the Maryland Court of Appeals stated, *id*. at 143, 916 A.2d at 277:

> This Court has held ... that a private party suing under the Consumer Protection Act must establish "actual injury or loss." *Citaramanis v. Hallowell*, 328 Md. 142, 153–54, 613 A.2d 964, 969 (1992); *Morris v. Osmose*, 340 Md. 519, 538 n. 10, 667 A.2d 624, 635 n. 10 (1995); *McGraw v. Loyola Ford, Inc.*, 124 Md. App. 560, 581, 723 A.2d 502, 512 (1999), *cert. denied*, 353 Md. 473, 727 A.2d 382 (1999). *See* Md. Code (1975, 2005 Repl. Vol.) § 13–408 of the Commercial Law Article ("any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title"). We have, in earlier cases, established that, in order to articulate a cognizable injury under the Consumer Protection Act, the injury must be objectively identifiable. In other words, the consumer must have suffered an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance on the sellers' misrepresentation. *Golt v. Phillips*, 308 Md. 1, 11–14, 517 A.2d 328, 333–335 (1986); *Citaramanis*, 328 Md. at 151–53, 613 A.2d at 968–70 (1992); *Morris v. Osmose*, 340 Md. at 538 n. 10, 667 A.2d at 635 n. 10 (1995); *McGraw v. Loyola Ford*, 124 Md. App. 560, 581, 723 A.2d 502, 512 (1999), *cert. denied*, 353 Md. 473, 727 A.2d 382 (1999).

As to an unfair trade practice claim under C.L. § 13–301, plaintiff looks to *Legg v. Castruccio*, 100 Md. App. 748, 642 A.2d 906 (1994), for the operative pleading requirements. *See* ECF 2, ¶ 88. In *Legg*, 100 Md. App. at 758, 642 A.2d at 911, the court considered the distinction between "unfair" and "deceptive" trade practices. The plaintiff argued that "although the [MCPA] does not provide an independent definition of unfair trade practice, and although the prohibited acts enumerated in the act 'primarily involve deception,' the list was never intended to be exhaustive." *Id*. at 764, 642 A.2d at 913. Thus, the plaintiff urged the court to "follow the approach followed by the FTC and federal courts and permit a cause of action for unfair trade practices independent from deceptive trade practices." *Id.*

The Maryland intermediate appellate court agreed that C.L. §§ 13–105 requires that, in "construing the term 'unfair or deceptive trade practices,' [Maryland state courts] give due

'consideration and weight' to the interpretation of that term by the FTC and federal courts." *Id.* at 764, 642 A.2d at 914.

Thus, the court looked to the Letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980), reprinted in H.R.Rep. No. 156, Pt. 1, 98th Cong., 1st Sess. 33–40 (1983), in defining an unfair trade practice. *Legg,* 100 Md. App. at 766, 642 A.2d at 915. The court noted that by 1964, the FTC had detailed three factors it considered evaluating a practice for fairness, *id.* at 767, 642 A.2d at 915*:*

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

And, the court explained that by 1980, the FTC shifted its primary focus to the last factor, *i.e.,* "consumer injury." *Id.* at 768, 642 A.2d at 915.  Quoting the FTC, the court said, *id.* at 768, 642 A.2d at 915-16:

> By itself, consumer injury could warrant a finding of unfairness. Nonetheless, not "every consumer injury is legally 'unfair.'" To warrant a finding of unfairness, "the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided."

Discussing each element of the consumer injury test, the court said, *id.* at 769, 642 A.2d at 916 (brackets and emphasis in original) (quotations and citations omitted):

> Regarding *substantial injury*, the Commission stated that it is not concerned with trivial or merely speculative harms. In most cases a substantial injury involves monetary harm . . . [u]nwarranted health and safety risks may also support a finding of unfairness. On the other hand, [e]motional impact and other more subjective types of harm . . . will not ordinarily make a practice unfair.
>
> The *countervailing benefits test* recognizes that most business practices entail a balancing of costs and benefits to the consumer.  Since many trade practices provide a mixed bag of costs and benefits, the Commission will not find that a

practice unfairly injures consumers unless it is injurious in its net effect. This analysis includes the costs to society in general in the form of increased paperwork, increased regulatory burdens on the flow of information, reduced incentives to innovation and capital formation, and similar matters.

The guiding principle of the *not reasonably avoidable injury test* is that [n]ormally we expect the marketplace to be self-correcting, and we rely on consumer choice—the ability of individual consumers to make their own private purchasing decisions without regulatory intervention—to govern the market. We anticipate that consumers will survey the available alternatives, choose those that are most desirable, and avoid those that are inadequate or unsatisfactory.

A "consumer injury" under *Legg*, 100 Md. App. 748, 642 A.2d 906,  is distinct from, but not inconsistent with, the requirement that a plaintiff asserting a claim under the MCPA must plead an "actual injury." An "actual injury" under the MCPA must be "objectively identifiable." *Lloyd,* 397 Md. at 143, 916 A.2d at 277. This requirement applies to both deceptive and unfair trade practices. But, a consumer injury is essential to a claim for an unfair trade practice.

Judges in the District of Maryland continue to draw on *Legg* to determine the viability of a claim under the MCPA. *See, e.g., Oyathelemi v. L.J. Ross Assocs*., DKC 20-3424, 2022 WL 4368156, at *18 (D. Md. Sept. 21, 2022) (citing *Hibdon,* 2015 WL 4249525, at *7, in turn extensively discussing *Legg*, 100 Md. App. 748, 642 A.2d 906).[15]

In *Sager v. Housing Com'n of Anne Arundel County*, 957 F. Supp. 2d 627 (D. Md. 2013), Magistrate Judge Gauvey discussed an unfair trade practice claim. She distilled the holding in *Legg*, 100 Md. App. 748, 642 A.2d 906, and explained, *Sager*, 957 F. Supp. 2d. at 642:

While the MCPA is primarily targeted at deceptive trade practices, it also offers a private cause of action for unfair trade practices. *Legg v. Castruccio*, 100 Md. App. 748, 642 A.2d 906 (Md. Ct. Spec. App. June 13, 1994). Relying on a lengthy analysis of the consumer unfairness doctrine espoused by the Federal Trade Commission, the Maryland Court of Special Appeals determined that whether a trade practice was "unfair" under the MCPA turned primarily on the type of the injury suffered by the consumer. *Legg,* at 767–71, 642 A.2d 906. The court

---

[15] Neither party analyzes the elements of an unfair trade practice, as laid out in *Legg*, 100 Md. App. 748, 642 A.2d 906. *See* ECF 13; ECF 14; ECF 19.

determined that to be considered unfair under the MCPA, a trade practice must result in a: (1) substantial injury; (2) that is not outweighed by any countervailing benefits to the consumer or to competition that the practice produces; and (3) it must not be the type of injury that a consumer could reasonably have avoided. *Id.* at 768, 642 A.2d 906.

As discussed, a plaintiff is required to plead an actual injury to proceed on a claim under the MCPA, whether based on an unfair or deceptive trade practice. To succeed on an unfair trade practice claim, a plaintiff also must plead substantial injury. Plaintiff has done so. Further, the Lease Addendum does not appear to benefit competition. *See* ECF 2, ¶ 95.  And, Shadrin claims that he "could not reasonably avoid" the unfair practice, as "the clause was a standard clause in a standard lease and was not up for negotiation."  *Id.* ¶ 96.[16] Plaintiff has adequately pleaded facts sufficient to state a claim that the combination of the automatic renewal clause with the "new terms provision" is an unfair trade practice, in violation of the MCPA.

Plaintiff also claims the "new terms provision," on its own, violates the MCPA. *Id.* ¶¶ 91, 99. Shadrin asserts: "The use of the new terms provision causes substantial injury, by binding tenants to high-cost, short term renewals, on short notice." *Id.* ¶ 90; *see also id.* ¶ 94 (the "new terms provision" exposes consumers, *inter alia*, to "increased rates of rent, with very little time available for the tenant to object to the lease."). Shadrin also contends that the provision violates R.P. § 5-101, *i.e.,* the statute of frauds. ECF 2, ¶ 92.

The "new terms provision" serves to bind a tenant to a new lease, but only in the event that the landlord provides a notice of its intent to terminate the lease and, in the notice, provides new terms that are not timely declined. ECF 13-3 at 16; *see also* ECF 2, ¶ 24. Shadrin and defendants agree that defendants did not send Shadrin a notice of intent to terminate the Lease. ECF 13-1 at

---

[16] Shadrin does not allege any facts indicating that he ever attempted to revise the "standard clause."

46

5; ECF 2, ¶¶ 22-23. If the parties' position is accurate, then Shadrin could not have been injured by the "new terms provision," because the new terms provision would not have been triggered.

Nonetheless, for the reasons discussed earlier, I shall assume that the April 2020 Letter constituted a notice of intent to terminate the Lease with an offer of new terms, and therefore the "new terms provision" is implicated. Even so, Shadrin's MCPA claim would fail on this basis. Shadrin's MCPA claim as it relates solely to the "new terms provision" hinges on Shadrin's allegation that the provision treats "14 days of silence by the tenant as acceptance of the new lease, whatever the terms may be." ECF 2, ¶ 89.

However, the April 2020 Letter clearly described the new terms as "options for your *renewal* lease term." ECF 13-5 at 2 (emphasis added).  And, it clearly reminded Shadrin that he had approximately seven weeks to determine whether to renew the Lease.  The letter was sent on April 2, 2020, and expressly notified plaintiff of his right to terminate the Lease by May 20, 2020. *Id.* at 2.

In other words, defendants did not eviscerate Shadrin's ability to provide 60 days' notice of his intent not to renew the Lease and to vacate at the end of the fixed term, without penalty. ECF 13-3 at 16. For example, if Shadrin did not respond within fifteen days, Shadrin's failure to object would bind him to the new renewal terms, *if he renewed*. But, Shadrin retained the ability to avail himself of his right to give 60 days' notice of his intent not to renew the Lease.

As noted, plaintiff also argues that the provision violates the statute of frauds. In Maryland, leases generally must be signed and in writing. R.P. § 5-101. But, R.P. § 5-101 "is not applicable to a leasehold estate not exceeding a term of one year." R.P. § 5-102. And, the renewal term was not for a period exceeding one year.

Accordingly, Shadrin cannot advance his MCPA claim on the basis of an alleged injury caused solely by the "new terms provision."

### IV.  Conclusion

For the reasons stated above, I shall grant the Motion in part and deny it in part. I shall deny the Motion as to Count II and Count IV.  To the extent that Count III involves an alleged injury based solely on the "new terms provision," I shall grant the Motion. I shall otherwise deny the Motion as to Count III.

An Order follows, consistent with this Memorandum Opinion.


Date:   July 19, 2023                              _____/s/_____
                                                                    Ellen L. Hollander
                                                                    United States District Judge

48